**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONETTE N. NEWBERT                         CASE NO. 20-11696

      *Plaintiff,*                              HON. NANCY G. EDMUNDS
*v.*                                                      DISTRICT JUDGE

COMMISSIONER OF                            HON. PATRICIA T. MORRIS
SOCIAL SECURITY,                           MAGISTRATE JUDGE

      *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 16)

## I.   RECOMMENDATION

Plaintiff Donette Newbert challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits ("DIB"). The case was referred to the undersigned for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 14), **GRANTING** the Commissioner's motion, (ECF No. 16) and affirming the decision.

## II.   REPORT

### A.   Introduction and Procedural History

Plaintiff's application for DIB was filed on March 29, 2018. (ECF No. 12-5, PageID.171.) She alleged she became disabled on July 31, 2017. (*Id.*) The Commissioner

1

denied the claim on August 16, 2018. (ECF No. 12-4, PageID.106.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on March 5, 2019. (ECF No. 12-4, PageID.136; ECF No. 12-2, PageID.67.) The ALJ issued a decision on June 7, 2019, finding that Plaintiff was not disabled. (ECF No. 12-2, PageID.51.) The Appeals Council denied review on May 5, 2020. (*Id.* at PageID.40.) Plaintiff sought judicial review on June 25, 2020. (ECF No. 1.) The parties filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 14, 16.)

### B.    Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

2

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

### C.     Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is

determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement . . . or a
> combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your
> impairment(s). If you have an impairment(s) that meets or equals one of our
> listings in appendix 1 of this subpart and meets the duration requirement, we
> will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional
> capacity and your past relevant work. If you can still do your past relevant
> work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual
> functional capacity and your age, education, and work experience to see if
> you can make an adjustment to other work. If you can make an adjustment

to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 12-2, PageID.62.) At step one, the ALJ found Plaintiff met the insured status requirements through December 31, 2022 and had not engaged in substantial gainful activity from the alleged onset date of July 31, 2017. (*Id*. at PageID.56.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: systemic lupus

erythematosus; antiphospholipid syndrome; polyneuropathy; pseudotumor cerebri; arthritis; anemia; hypertension, asthma; and obesity. (*Id.*) These impairments did not meet or medically equal a listed impairment at step three. (*Id.* at PageID.56-57.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a) except: occasionally climbing ramps; never climbing stairs, ladders, ropes, or scaffolds; occasionally balancing, stooping, and crouching; never crawling or kneeling; frequently handling and fingering, bilaterally; may occasionally use computer keyboards or typewriters; must avoid concentrated exposure to extreme cold, extreme heat, humidity, and vibration; may never work around unprotected heights or hazardous machinery; never use left foot controls; never work outdoors in bright sunshine or with bright or flickering lights, such as would be experienced in welding or cutting metals; due to symptoms associated with physical deficits, limited to jobs without fast-paced production requirements.

(*Id.* at PageID.57.) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.60.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including order clerk, document preparer, and charge-account clerk. (*Id.* at PageID.61-62.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.62.)

### E.    Administrative Record

#### i.    Plaintiff's Testimony at the Administrative Hearing

At the time of the hearing, Plaintiff was 30 years old, lived with her husband and seven-year-old daughter, and had two or three years of college education. (ECF No. 12-2, PageID.71.) She had an expired mortgage loan originator license and had most recently worked for Quicken Loans in the collections department. (*Id.* at PageID.71-72.) Plaintiff testified that this was a sedentary desk job, and she was not required to lift more than ten

pounds in that position. (*Id.* at PageID.72.) She left that position because of her pseudotumor headaches, which were "becoming a very large problem" and which she described as "like a migraine times like 100." (*Id.* at PageID.72-73.) She testified that looking at her computer screen would trigger these headaches. (*Id.* at PageID.73.)

The ALJ questioned Plaintiff about her work history. (*Id.* at PageID.73-74.) She had previously worked as a bank teller for PNC Bank and as a cashier at Meijer. (*Id.* at PageID.74.) Plaintiff indicated that she would like to go back to work if she found helpful treatments for her ailments, including lupus, for which she had tried taking several medications—although, she indicated that these medications did not provide her much relief. (*Id.* at PageID.76.)

Plaintiff testified that she gets headaches about once a week and a headache will usually last at least one day, but sometimes will last up to two or three days. (*Id.*) She spends most of her day, on a typical day, sitting or sleeping on the couch or watching television. (*Id.* at PageID.77.) She can do some chores when she has a "good pain day." (*Id.*) She testified that her pain is centered in her elbow and goes down through her wrists and fingers. (*Id.*) She stated that she experienced great pain holding her cellphone in her hand when the pain is bad. (*Id.*) She used a cane on the day of the hearing and testified that she had used it for about the last six months, although it was not prescribed by a doctor. (*Id.* at PageID.80.) She can sit for "a couple hours before [she has] to get up and stretch[,]" can stand for about ten minutes, can walk about one city block, and can lift about five pounds. (*Id.* at PageID.81.) She has difficulty with typing or word processing, stating "my

fingers will swell and get very painful . . . I got [sic] about 20 minutes before I'm done."

(*Id.* at Page ID.81-82.)

### ii.    The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The VE identified Plaintiff's past work as follows: 1) collection clerk, sedentary work, DOT code 241.357-010, SVP 5; 2) mortgage clerk, sedentary work, DOT code 249.362-014, SVP 5; 3) cashier, light work, DOT code 211.462-018, SVP 3, and 4) bank teller, light work, DOT code 211.362-018, SVP 5. (*Id.* at PageID.83.) The ALJ inquired of a hypothetical individual of Plaintiff's age, education, and work history who could perform:

> sedentary work activities as defined in the regulations with the following limitations. Occasionally climbing ramps. Never climbing [stairs, ladders, ropes, or scaffolds.] Occasionally balancing, stooping, and crouching. Never crawling or kneeling. Frequently handling and fingering bilaterally. May only occasionally use computer keyboards or typewriters. Must avoid concentrated exposure to extreme cold, extreme heat, humidity or vibration. May never work around unprotected heights or hazardous machinery. Never left foot controls. May never work outdoors in bright sunshine or with bright or flickering lights such as would be experienced in welding or cutting metals. Due to symptoms associated with physical deficits limited to jobs without fast-paced production requirements.

(*Id.* at PageID.84.) The VE stated that such an individual could not perform Plaintiff's past relevant work "because all – both of those jobs required frequent use of computers." (*Id.*) When asked what work, if any, would be available for such an individual, the VE provided the following jobs as appropriate for the hypothetical individual posed by the ALJ: food order clerk, DOT code 209.567-014, SVP 2, sedentary work, 40,000 jobs available; document preparer, DOT code 249.587-018, SVP 2, sedentary work, 60,000 jobs available;

and charge clerk, DOT code 205.367-014, SVP 2, sedentary work, 70,000 jobs available. (*Id*. at PageID.85.)

The ALJ posed a hypothetical individual who had all the same limitations as previously mentioned, but in addition, would be off task 20% of the normal workday "over and above normally scheduled breaks[.]" (*Id.* at PageID.85.) The VE testified that "no employer would tolerate that amount of off-task behavior." (*Id*.) The VE stated that, in her opinion, employers would tolerate only up to 10% of the day off-task after normal breaks. (*Id*.)

Upon cross-examination by Plaintiff's counsel, the VE testified that an individual who was limited to only occasional handling and fingering in addition to occasional use of a computer, keyboard, or typewriter would "rule out all sedentary employment." (*Id*. at PageID.86.)

The VE testified that her testimony was consistent with the DOT, although she provided that the DOT "does not address off task behavior. And for that portion of my testimony I rely on my experience with job placement and job analysis." (*Id*. at PageID.85.)

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

8

(2) Licensed Psychologist, which includes:

 (i) A licensed or certified psychologist at the independent practice level; or

 (ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an

individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area

of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single

analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about

whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will

carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)     [D]aily activities;

    (ii)    The location, duration, frequency, and intensity of . . . pain;

    (iii)   Precipitating and aggravating factors;

    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

## G.    Arguments and Analysis

Plaintiff argues that the ALJ's decision regarding Plaintiff's eligibility, or lack thereof, for DIB is not supported by substantial evidence. (ECF No. 14, PageID.1231.) Specifically, Plaintiff argues that the ALJ did not properly consider all of Plaintiff's functional limitations in determining her RFC and erred in reaching his own medical conclusion as to Plaintiff's RFC. (*Id.* at PageID.1231-32.) Plaintiff contends that the ALJ

18

erred when he rejected the opinion of the consultative examiner and "substituted his own medical judgement, without referring to either medical or non-medical evidence which would support his conclusion[.]" (*Id*. at 1232.)

As a preliminary matter, Plaintiff's disability application was filed on March 29, 2018.[1] (ECF No. 12-5, PageID.171.) Her case was filed after March 27, 2017, and accordingly, the evaluation of Plaintiff's case is not subject to the treating-source rule stated in 20 C.F.R. § 404.1527; formerly, "good reasons" was the explanation for the weight given to a treating source's medical opinion. Now, the ALJ must consider the medical opinions in the case and articulate their persuasiveness with the factors established by 20 C.F.R. § 404.1520c.

I will first address Plaintiff's argument that the ALJ failed to properly consider Plaintiff's functional limitations in determining her RFC. Specifically, Plaintiff takes issue with the ALJ's analysis of Plaintiff's headaches and argues that the ALJ failed to accommodate for such headaches in the RFC determination.

My review of the medical record and evidence regarding Plaintiff's headaches reveals the following objective medical findings: a report from Wayne Neurology dated March 29, 2017, notes several treatment notes including one from August 15, 2016, stating that "[t]he patient like the Diamox 1000 mg twice a day. She says her headaches are much better and she feels her vision is better[]" (ECF No. 12-7, PageID.261) and a note from

---

[1] In the ALJ's written decision, found in the docket at ECF No. 12-2, PageID.54, the ALJ writes that Plaintiff's application was filed on March 19, 2018—however, ECF No. 12-5, PageID.171, Plaintiff's Application Summary for Disability Insurance Benefits, notes the application date as March 29, 2018. Because both of these dates fall well past the new regulation date of March 27, 2017, this discrepancy does not change the analysis.

November 3, 2016 stating "[t]he patient feels the baclofen [sic] works very well for her. She is taking 10 mg twice a day. She feels that her vision is a bit off. She feels the right is worse than the left. She is not have any [sic] other headaches however." (*Id.* at PageID.262.) On December 1, 2016,[2] she reported that "her headaches are slightly worse[]" (*id.*) and on March 29, 2017, she reported that "the trigger point injections she received last time did break her headaches." (*Id.*) On the same date Plaintiff reported that "her headaches are getting worse again and she had her headache for six out of seven days over the last three weeks." (*Id.* at PageID.324.) The report later states Plaintiff has "pseudotumor cerebri which appears to be well controlled with Diamox thousand milligrams twice a day. With this her headaches are well controlled and her vision is better." (*Id.* at PageID.263.)

A report notes from a Henry Ford Health System emergency room from July 10, 2017 provide "28 y.o [sic] female with a hx of migraines, . . . [p]atient presents the ER neurologically intact however with symptoms consistent with a post epidural headache. Patient is sent by her neurologist. I did discuss the case with her neurologist, Dr. Holtzman who evaluated patient this morning . . . [p]atient did drive herself to the ER however it was very difficult for her as sitting upright made her very nauseous and she did vomit EN route, given this will transfer via EMS." (ECF No. 12-11, PageID.857.) The same report notes Plaintiff was not seeing "significant relief" from taking Diamox and "started experiencing

---

[2] I note that Plaintiff alleges her disability did not begin until July 31, 2017. As Defendant points out, "Plaintiff begins by citing a July 2016 examination from Dr. Holtzman (PageID.1233-1234 citing PageID.261), but that record pre-dates her alleged onset date by about a year (PageID.171) and fails to reflect her functioning during the relevant period." (ECF No. 16, PageID.1254.) These medical notes are included here nonetheless for a complete picture of Plaintiff's medical history.

the headache with associated nausea and vomiting. States that the headaches are worse when sitting or standing upright." (*Id*. at PageID.854.)

In December 2017, Plaintiff reported to Wayne Neurology that "[s]he spends 90% of her time sleeping secondary to her headache since she cannot look at a computer screen." (ECF No. 12-13, PageID.1095.) In January 2018, Plaintiff reported to Wayne Neurology that "she did not take the Diamox but did take the Nortriptyline and finds the headaches are remarkably better." (ECF No. 12-13, PageID.1095.) In April 2018, she reported to Wayne Neurology that "her headache is back and she feels as though it occurs during a lupus flare." (ECF No. 12-13, PageID.1095.) Later, on October 18, 2018, a report from Wayne Neurology states that Plaintiff was continuing to take Diamox and "[s]he says it's helping her headaches and she feels very good." (ECF No. 12-13, PageID.1089-1090.) A report dated December 10, 2018 from the Henry Ford Health System noted that Plaintiff "tolerated prednisone well in the past and steroids held the headaches." (ECF No. 12-13, PageID.1177.)

First, I note that ALJ found Plaintiff's headaches were indeed a severe impairment. This finding, though, does not mean the ALJ erred by finding that there was certain work in the national economy Plaintiff would be able to perform, nonetheless. "A claimant's severe impairment may or may not affect his or her functional capacity to work. One does not necessarily establish the other." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (quoting *Yang v. Comm'r of Soc. Sec.*, No. 00-10446, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004)).

21

The ALJ made note of the medical findings in the record, writing in his opinion "[t]he claimant continued to report having headaches and 'mildly' blurry vision due to her pseudotumor cerebri, however, the claimant consistently maintain [sic] 'good' attention and concentration throughout the record (Record). Moreover, notes indicate that the claimant experienced improvement with respect to her pseudotumor cerebri with conservative treatment (12F/36)." (ECF No 12-2, PageID.58.) The ALJ wrote that he found the opinion of state agency consultant Robin Mika, D.O. to be persuasive as it was "most consistent with the overall objective evidence," (*Id*. at PageID.60), and found that another opinion by consultative examiner Bina Shaw, M.D. was "not persuasive at all" as this opinion was "inconsistent with his own examination, with the overall objective evidence of record, and with the other physician opinion evidence that is consistent with the overall objective evidence." (*Id*.)

I suggest that the ALJ's assessment of Plaintiff's headaches and subsequent determination of her RFC was supported by substantial evidence. This Court "reviews the record as a whole to determine whether the ALJ's decision is supported by substantial evidence." *Keeton v. Comm'r of Soc. Sec.*, F. App'x 515, 527 (6th Cir. 2014). My review of the record evidence finds several instances where Plaintiff's medical records indicate success treating her headaches with medications and treatments. Although there are some instances where Plaintiff complains of her headaches, there are also several instances of reported relief from medication—for this Court to now use this same record evidence to arrive at a contrary conclusion would be reweighing the evidence, and "the court will not reweigh the evidence considered by the ALJ." *Seibert v. Comm'r of Soc. Sec.*, 2019 WL

147066 at *2 (E.D. Mich. 2019) (citing *Big Ranch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013)). Whether Plaintiff or even this Court disagrees with the conclusions of the ALJ, if it is supported by substantial evidence, it must not be disturbed. Even if the opposite conclusion could plausibly be supported, if the ALJ's decision is supported by substantial evidence, as it is here, it must stand.

Plaintiff also argues that the ALJ's limiting Plaintiff's ability to situations where she is not exposed to bright or flickering lights did not properly accommodate Plaintiff's headaches. (ECF No. 14, PageID.1236-37.) As such, Plaintiff argues, "the RFC fails to accurately reflect the Plaintiff's functional abilities and limitations, [and] the determination of the Commissioner based thereon is not supported by substantial evidence." (*Id.* at PageID.1237.) However, there are at least two instances in the record which indicated Plaintiff's sensitivity to light and that the light triggered her headaches: at the hearing Plaintiff testified that looking at her computer screen would trigger these headaches (ECF No. 12-2 PageID.73), and a December 2017 medical note from Wayne Neurology reported that "she cannot look at a computer screen." (ECF No. 12-13, PageID.1095.) Thus, I suggest that there is, in fact, substantial evidence in the record to support the limitations placed on Plaintiff's ability to work in environments with certain lighting as a proper limitation for her headaches.

Next, Plaintiff argues that the ALJ "improperly substituted his own medical opinion to derive Plaintiff's RFC" by determining her RFC should include an ability to do frequent handling and fingering. (ECF No. 14, PageID.1237.) Plaintiff argues that the ALJ rejected Dr. Shaw's opinion and "played doctor." (*Id.* at PageID.1239.)

At the outset, I point out an important rule in this Circuit, which Defendant raised in support of its position: "there is no requirement that the ALJ must base his RFC finding on a medical opinion." (ECF No. 16, PageID.1260) (citing *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x. 395, 401 (6th Cir. 2018) (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. 2017)); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding.").

Regarding Plaintiff's range of motion in her hands and fingers, the ALJ relied on the record evidence, writing, "[t]he claimant also had positive inflammatory arthritis on objective screening (3F/3)"; and later "[o]n examination, the claimant showed decreased grip strength and range of motion in her right upper extremity, however, she had normal range of motion in her neck and back (10F/67). Subsequent grip strength testing shows that the claimant has full 5/5 grip strength (14F/8)." (ECF No. 12-2, PageID.58-59.) The ALJ ultimately concluded that "[t]he severity of the claimant's subjective reports to her physicians and her allegations are inconsistent and unsupported by the overall objective evidence of record" and noted that Plaintiff had a "full 5/5 grip strength in her upper extremities (12F/36, 3F/1, 14F)." (*Id*. at PageID.59.)

Dr. Mika's opinion, upon which the ALJ relied, stated the following: Plaintiff had "good hand dexterity" and recommended "bilateral frequent" in terms of a manipulative limitation. (ECF No. 12-3, PageID.97-98.) Dr. Mika recommended limited handling or gross manipulation and unlimited fingering or fine manipulation. (*Id.* at PageID.97.) The ALJ did not "play doctor" and relied upon evidence in the record, which was cited in the written opinion. The ALJ rejected the opinion of Dr. Shaw, which concluded that Plaintiff had complete range of motion in her hands and fingers, and instead relied upon the opinion of Dr. Mika and the other record medical evidence noted to conclude that Plaintiff would be able to perform frequent bilateral handling and fingering. I suggest that this evidence substantially supports the decision and that Plaintiff's argument is without merit.

### H.   Conclusion

For these reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 14), and **GRANTING** the Commissioner's motion, (ECF No. 16), and affirming the decision.

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: March 3, 2021                        S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge